**SPACE IMAGING EUROPE, LTD. and Tower Group, Inc., Plaintiffs,**

v.

**SPACE IMAGING L.P., Space Imaging, Inc., and Space Imaging/Eosat LLC, Defendants.**

**No. 98 CIV. 2291 (DC).**

United States District Court, S.D. New York.

March 17, 1999.

Barton & Zasky by Robert S. Altman, New York City, for Plaintiffs.

Storch Amini & Munves, P.C. by Bijan Amini, Janis Ettinger, New York City, for Defendants.

## OPINION

CHIN, District Judge.

In this diversity case, plaintiffs Space Imaging Europe, LTD. and Tower Group, Inc. move for summary judgment on the question of whether defendants Space Imaging L.P., Space Imaging, Inc. and Space Imaging/EOSTAT LLC were required to give plaintiffs a right of first refusal based on a letter of intent ("LOI") that the parties executed in September 1997. Defendants cross-move for summary judgment, contending that there was no meeting of the minds as to the enforceability of the LOI. For the reasons stated below, plaintiffs' motion for summary judgment is denied and defendants' motion is granted. The complaint is dismissed with prejudice.

Prior to these motions being filed, the Court *sua sponte* ordered plaintiffs to show cause why they should not be required to post a security bond pursuant to

Local Civil Rule 54.2 based on the Court's view that plaintiffs had failed to litigate this case in a manner consistent with having a meritorious claim. Because I conclude that plaintiffs' complaint should be dismissed, the issue of a security bond pursuant to Local Civil Rule 54.2 is moot and I do not reach it.

## BACKGROUND

### A. *The Facts*

The basic facts underlying this dispute were discussed in the Court's prior decision on plaintiffs' motion for a preliminary injunction. *See Space Imaging Europe, Ltd. v. Space Imaging L.P.*, No. 98 Civ. 2291, 1998 WL 190356, at *1 (S.D.N.Y. Apr. 21, 1998) ("*Space Imaging I* "). Additional facts have come to light during discovery. Construed in the light most favorable to plaintiffs, the facts are as follows:

### 1. *The Parties and Summary of Events*

Defendants are in the business of developing and marketing high resolution geographic images from satellites. In the spring of 1997, defendants began searching for parties with whom they could contract for the right to market and operate their IKONOS satellite abroad. (*See* Barton MSJ Aff. ¶ 5). The contracts that defendants hoped to enter into—a Regional Affiliate Agreement ("RAA") and a Regional Operations Center Purchase Agreement ("ROCPA")—would give a contracting party the exclusive right to market and transmit IKONOS satellite images within a certain territory.

Plaintiffs are shell corporations that are owned and/or managed by Emmanual Ducas. At some point during the spring of 1997, defendants began negotiating with Ducas for the exclusive right to be a Regional Affiliate for a certain territory that included parts of Europe, the Middle East, and North Africa (the "Territory").

Initially, defendants communicated with Ducas through a consultant named Jon Monett. (Mueller Aff. ¶ 2). In June 1997, however, Monett introduced Ducas to John Copple, defendants' chief executive officer, and Conrad Mueller, defendants' vice president for international communications. (Barton MSJ Aff. ¶ 6). Shortly after being introduced to Copple and Mueller, Ducas requested that defendants enter into a Letter of Intent ("LOI") as to the parties' negotiations with him. (*Id.* ¶ 7; Mueller Dec. ¶ 4).

### 2. *The LOI*

The parties signed a three-page LOI that was dated September 22, 1997 on September 25, 1997. The letter was printed on defendants' letterhead and was addressed to Ducas. Ducas signed on behalf of "an entity to be named later," and Copple signed on behalf of defendants.

The LOI contains three introductory paragraphs, each containing cautionary language as to the purpose of the LOI. These paragraphs read as follows:

> Space Imaging is pleased to document the basis upon which we intend to negotiate to reach an agreement with you (or an entity that you control) in regard to the execution of a Regional Affiliate Agreement ("RAA") and the construction, management and operation of a Regional Operations Center ("ROC") located in Greece or any location that you designate within the geographic area set forth on Exhibit A hereto (the "Territory"). This ROC will allow you to . . . market[ ] and sell minutes of imaging sensor . . . time and images transmitted from Space Imaging's IKONOS satellite . . . to be launched late in 1997, or that will be transmitted by any satellite launched by Space Imaging or its successors for up to ten (10) years after the effective date of the RAA. *This letter is not a binding agreement. It is written to memorialize our discussions thus far and to serve as a basis to go forward.*

The offer described herein *is subject to successful conclusion of negotiations by December 31, 1997.* Successful conclusion means the signing of a RAA and ROCPA. Space Imaging will grant you 60 days from the signing [of both agreements] to make any initial payment required under the RAA or ROCPA.

The key points of a *future series of agreements,* the first of which being the RAA, is *to be executed no later than December 31, 1997,* are as follows:

(Copple Dec. Ex. A (emphasis added)).

The introductory paragraphs are followed by eighteen bullet point provisions. These bullet point provisions are not divided into subsections, nor are any of them preceded by narrative language other than the three introductory paragraphs quoted above. The first thirteen of these provisions discuss mechanics related to the RAA and ROCPA agreements, setting forth certain rights and responsibilities of the parties. For instance, several of these provisions contain language such as, "You will have the right to . . . ." (*Id.* (bullet points 2, 7, 9, 10)). A number of provisions also outlined defendants' responsibility to provide Ducas with assistance. (*Id.* (bullet points 3, 4, 5, 8, 11)).

The last five bullet points also contain cautionary language as to the effect of the LOI and the provision at issue in this case concerning a right of first refusal (hereinafter the "Provision"). These bullet points read as follows:

- Each party to this [LOI] is an independent contractor, and this letter does not make either party a partner or agent of the other party. Neither party has, nor will it represent to third parties, any authority or right to act for or obligate the other party. This [LOI] does not create any binding relationship, contract, joint venture, partnership, trust or agency.

- Neither party has committed to any exclusivity regarding dealing with the other during the negotiations.

- You will have the right to match or better any offer made by a competing entity in the Territory prior to Space Imaging contracting with such entity. If you match or better such a competing offer, you will be awarded the contract(s) with Space Imaging.

- Each party hereby retains all rights to any property, patents, products and information it now owns or generates.

- Each party bears its own cost and expenses related to these efforts.

(*Id.* (bullet points 13–18)). The LOI does not provide that any of these bullet points are to be treated any differently than any of the other provisions in the agreement.

The LOI does not state that any consideration was being given by or to the other side. Nor was any tangible consideration in fact exchanged. Copple declares that defendants received no consideration for the LOI in general, or for the right of first refusal in particular. (*See* Copple Dec. ¶ 2). Plaintiffs do not disagree.

### 3. *Negotiating History*

The parties exchanged several drafts of the LOI before executing the LOI dated September 22, 1997. As noted, the parties entered into the LOI at plaintiffs' urging. Ducas sent defendants a one-page draft LOI on June 8, 1997 ("Draft One"). (Mueller Dec. Ex. A). Draft One opened with the statement that it "sets forth the bases upon which we *intend to reach an agreement* with you . . . ." (*Id.* (emphasis added)). Draft One proceeded to list, in bullet point fashion, the "key points upon which [the parties] *intend to agree in writing.*" Draft One did not contain a right of first refusal provision, an expiration date, or any other cautionary language as to whether it created a binding contract.

On August 7, 1997, Copple forwarded information to Ducas about defendants' business that Ducas had requested. In addition, Copple sent Ducas a revised two-page draft LOI ("Draft Two"). (*Id.* Ex. B). Draft Two limited the language con-

cerning the parties' intent. It opened with the statement that the document was "the basis upon which we *intend to negotiate to reach an agreement* ...." (*Id.* (emphasis added)). Draft Two also contained a time limitation, noting up front that the "key points of a future agreement that would be executed within the next 90 days are as follows." (*Id.*). In the portion of the document containing bullet points, defendants also added the following:

> Each party to this Letter of Intent is an independent contractor, and this letter does not make either party a partner nor agent of the other party. Neither party has, nor will it represent to third parties, any authority or right to act for or obligate the other party. This Letter of Intent does not create any binding relationship, joint venture, partnership, trust, or agency. The intent is to document the interest and discussions that have occurred and serve as a basis to go forward.

(*Id.*). In addition, defendants added three other provisions as to the parties' costs, expenses, proprietary rights, and non-commitment to exclusivity regarding their dealings with each other.

Ducas faxed Mueller a "Revised Proposed Letter of Intent" on August 19, 1997 ("Draft Three"). (*Id.* Ex. C). Draft Three retained the provisions that defendants had included in Draft Two. Draft Three opened with a paragraph stating the purpose of the LOI and then listing, in bullet points, the "key points of an agreement to be executed as quickly as possible, and no later than 90 days ...." (*Id.*). Ducas, however, included the following provision toward the end of Draft Three:

> You will have the right to match or better any offer made by a competing entity prior to Space Imaging contracting with any such entity; if you match or better such a competing offer, you will be awarded the contract(s) with Space Imaging.

(*Id.*).

Defendants prepared a revised three-page draft on September 4, 1997 ("Draft Four"). (*Id.* Ex. D). Defendants did not take out the bullet point containing the Provision. They did, however, change the provision slightly. They added the words "in the Territory" so that the sentence stated "You will have the right to match or better any offer made by competing entity in the Territory prior to Space Imaging contracting with such entity." In addition, however, defendants added the following statement to LOI's opening, explanatory paragraph: "This letter is not a binding agreement. It is written to memorialize our discussions thus far and to serve as a basis to go forward." (*Id.*)

The parties met in New York on September 11, 1997 and September 18, 1997 to further discuss the RAA and ROCPA. The September 22, 1997 LOI that the parties ultimately executed did not vary the terms of Draft Four in any significant way, except that an additional, introductory paragraph was added to page one of the LOI stating that the offer described in the LOI "is subject to successful conclusion of negotiations by December 31, 1997." (Copple Dec. Ex. A).

### 4. *The Parties' Intent*

#### a. *Plaintiffs*

Plaintiffs offer no declaration as to the parties' intent to be bound by the LOI in general or the Provision in particular. Rather, plaintiffs contend that the deposition testimony of Frank Fotis, Ducas's partner and/or agent with respect to negotiations with defendants, "is the only extrinsic testimony available" on the question of the parties' intent. (Pls. Mem. at 8). Fotis's testimony consists of the following statements:

> Q. What discussions, if any, were there about a right of first refusal?
>
> A. It's a major point in the contract. I mean, pardon me, in the letter of intent.

Q. What discussions were there about it in your negotiations, if you recall?

A. The purpose for the right of first refusal and its coverage .... We explained to them [both Copple and Mueller]—we explained to them the need for the right of first refusal .... The need is to help us have guts in front of the financial community .... it gives you backbone in front of the financial community .... So [the right of first refusal] had two purposes [to talk with the financial community and help plaintiffs presell time for the satellite]. And then it could also have a third purpose, of giving us the satisfaction that we know we don't have anyone ready to fire in our back and all of our work will go in vain, right?

(Fotis Tr. at 54–58). Fotis also testified as follows concerning his understanding of the LOI and what the "nonbinding" language in the LOI meant:

The rights that I believe come from a letter of intent in any circumstance, okay, are that the letter of intent is a document, a contractual document that, just like a contract itself, has a finite period of life. And it's provisions are applicable during the period of life .... Nonbinding agreement has to do with ultimately being able to sign the contract. The nonbinding does not mean that this provision is invalid [referring to provision concerning plaintiffs using defendants' name]. Otherwise, why is it in here? Why is it negotiated? The nonbinding means that both parties agree in the letter of intent to go through the motions, marketing, financial, organizational, operational, and negotiations, to end up with a binding agreement. They may, yes, they may not sign the agreement that's the binding contract. The letter of intent prepares me to enter into those negotiations.

(*Id.* at 65, 74–75). Plaintiffs provide no declaration from Ducas as to the parties' intent nor do they respond to the state-ments of intent propounded by defendants. For instance, plaintiffs do not rebut Mueller's contention that he specifically told Ducas and Fotis prior to signing the LOI that it was non-binding in its entirety. (Mueller Dec. ¶ 7).

### b. *Defendants*

Copple declares that defendants understood the LOI "to be non-binding in every respect [or else he] would not have signed [the LOI] on Space Imaging's behalf." (Copple Dec. ¶ 3). As to why defendants agreed to the inclusion of the Provision that Ducas added to Draft Three of the LOI, Mueller declares that "[b]ecause the [LOI] was expressly non-binding even at that stage, and Space Imaging understood that it would not confer any presently enforceable rights on either party, we responded to that insertion by adding [the express statement at the beginning of the LOI], emphasizing the non-binding nature of the [LOI] as a whole." (Mueller Dec. ¶ 6). Mueller also declares that, before the LOI was signed, he "reiterated" to Ducas and Fotis "that the [LOI] was non-binding in its entirety and as to all of its terms." (*Id.* ¶ 7). Ducas and Fotis expressed "understanding and acceptance of that characterization." (*Id.*).

When asked at his deposition for his understanding of the Provision, Mueller responded as follows:

Well, I really had none. My effort to define this LOI and get it signed was to get into negotiations with Mr. Ducas. And whatever he cared to put in here, since in my vision this was a nonbinding agreement, we would encapsulate here to negotiate later in a[RAA].

(Mueller Tr. at 119).

### 5. *The Marcopoulos Deal*

Defendants signed an RAA and ROCPA on December 19, 1997 with Mr. Marcopoulos (the "Marcopoulos Deal"), but did not give plaintiffs the right to match or better the Marcopoulos Deal. After being pushed back a number of times, it appears that

the Marcopoulos Deal satellite launch will take place in late March or early April 1999. (*See* Defendants' Letter dated Feb. 18, 1999).

## B. *Prior Proceedings*

Plaintiffs commenced this suit on March 31, 1998 by moving by order to show cause for a temporary restraining order ("TRO") and preliminary injunction. I denied plaintiffs' request for a TRO and held a hearing on April 9, 1998. In a memorandum decision dated April 21, 1998, I granted plaintiffs' motion for a preliminary injunction only to the following extent: (1) defendants were ordered to provide plaintiffs with a copy of their current agreement with Marcopoulos so that plaintiffs could determine whether they could meet or beat the terms of the agreement; (2) the parties were to enter into a strict confidentiality agreement prior to the production of the agreement; (3) plaintiffs were to post a bond in the amount of $100,000; and (4) because it was not clear whether plaintiffs could match or better the Marcopoulos Deal, if plaintiffs wanted further injunctive relief, they would be required to renew their motion for a preliminary injunction. *See Space Imaging I*, 1998 WL 190356, at *3.

Plaintiffs did not, however, post the bond. Nor did they renew their motion for a preliminary injunction. In a conference on May 6, 1998, plaintiffs' counsel acknowledged the failure to proceed as directed by the Court in *Space Imaging I*, but represented that there were "practical difficulties" with respect to the strict confidentiality agreement. The parties thereafter proceeded to conduct discovery.

Discovery proved to be contentious. Despite the fact that I informed the parties that one issue in the case was whether plaintiffs had the financial ability to carry out the transaction in question, plaintiffs repeatedly failed to respond to defendants' requests for information concerning Ducas's personal finances. (*See* July 7, 1998 Tr. at 28). Indeed, having concluded that

the plaintiffs failed to respond adequately to several of defendants' discovery demands, I issued an order on August 18, 1998 that *inter alia* precluded plaintiffs "from presenting at trial any documentary evidence to demonstrate that they had the financial ability to carry out the transaction in question" that they had not produced as of August 18, 1998 or in response to the August 18, 1998 order. (*See* Aug. 18, 1998 Order). All discovery was to be completed by October 2, 1998. (*Id.*).

Because I was concerned about plaintiffs' conduct, I *sua sponte* ordered plaintiffs to show cause why they should not be required to post a security bond pursuant to Local Civil Rule 54.2. Plaintiffs responded to the order to show cause and simultaneously moved for summary judgment. Defendants' cross-motion for summary judgment dismissing the complaint followed.

## C. *The Parties' Allegations*

### 1. *Plaintiffs*

Plaintiffs contend that they are entitled to summary judgment on their claim that they had a right of first refusal effective September 1997 to December 1997 because the LOI *"clearly and unambiguously* contemplated that the parties were negotiating to enter into an exclusive contractual agreement for the Territory." (Pls. Mem. at 1 (emphasis added)). Thus, plaintiffs argue, the Provision "cannot be interpreted in any other manner except to grant the Plaintiffs the right to match or better a competing offer for the Territory." (*Id.* at 1–2).

Plaintiffs advance three arguments to support their position: (1) the provisions contained in the LOI "mandate[ ] that the [Provision] clearly grants a right of first refusal to Plaintiffs during the term of the LOI" (*id.* at 4); (2) the "intention of the parties clearly evidences a Right of First Refusal to the Plaintiffs during the term of the LOI" (*id.* at 6); and (3) defendants' interpretation of the Provision "is not ad-

missible as evidence and may not be considered." (*Id.* at 7).

### 2. Defendants

Defendants contend not only that plaintiffs' motion should be denied, but also that summary judgment dismissing plaintiffs' complaint is warranted because the Provision is unenforceable. Defendants maintain that the parties did not intend to create any enforceable rights under the LOI unless and until the parties entered into a formal, written contract as outlined in the LOI. Defendants further contend that, even if there were an enforceable right of first refusal, the case should be dismissed because plaintiffs cannot prove that they had the financial ability to match or better the Marcopoulos Deal.

## DISCUSSION

### A. Applicable Legal Standards

#### 1. Rights of First Refusal

■ A right of first refusal is "a contractual right to 'preempt' another." 3 Corbin on Contracts § 11.3, at 468–69 (rev. ed.1996) (hereinafter "Corbin"). The effect of a right of first refusal "is to bind the party who desires to sell not to sell without first giving the other party the opportunity to purchase the property at the price specified." *LIN Broadcasting Corp. v. Metromedia, Inc.*, 74 N.Y.2d 54, 544 N.Y.S.2d 316, 319, 542 N.E.2d 629 (Ct.App.1989) (citations omitted); *see also Time, Inc. v. Kastner*, 972 F.Supp. 236, 239 (S.D.N.Y.1997). Thus, the right of first refusal is a "restriction on the power of one party to sell without first making an offer of purchase to the other party upon the happening of a contingency." *LIN Broadcasting*, 544 N.Y.S.2d at 319, 542 N.E.2d 629.

Although the right of first refusal customarily arises in real property transactions, "the subject matter may be anything which parties may make the subject of contracts." Corbin § 11.3 at 469–69. Also, "right[s] of first refusal must be supported by consideration or its equivalent." *Id.* at 470.

### 2. Preliminary Agreements

Parties to a proposed commercial transaction "often enter into preliminary agreements, which may provide for the execution of more formal agreements." *Adjustrite Sys., Inc. v. Gab Bus. Servs., Inc.*, 145 F.3d 543, 547 (2d Cir.1998). If parties enter into such "preliminary agreements," but fail to "execute a more formal agreement, the issue arises as to whether the preliminary agreement is a binding contract or an unenforceable agreement to agree." *Id.*

■ Generally, "where the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract." *Id.* at 548. In some instances, however, preliminary agreements may be enforceable. *See id.* (describing circumstances where parties have either agreed on all points that require negotiation, including an intent to be bound, but agree to memorialize agreement in a more formal document, or where parties agree on certain major terms, but leave other terms open for further negotiation). The key is the intent of the parties, and their mutual intent to be bound. *Id.* (stating that "if the preliminary writing was not intended to be binding on the parties at all, the writing is a mere proposal, and neither party has an obligation to negotiate further").

### 3. Contract Interpretation

■ In a contract interpretation case under New York law,[1] the court must first

---

1. The parties have both assumed that New York law governs this controversy, and have relied on New York cases in their briefs. The Court must nevertheless conduct its own choice of law analysis based on New York's choice of law rules. *See Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). New York

decide whether the contract is ambiguous. *See Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 67 F.3d 435, 443 (2d Cir.1995) (citing *Sayers v. Rochester Tel. Corp. Supplemental Management Pension Plan*, 7 F.3d 1091, 1094 (2d Cir.1993)). A contractual provision will be considered ambiguous "whenever it admits of more than one interpretation 'when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in a particular trade or business.'" *MG Refining & Mktg., Inc. v. Knight Enters., Inc.*, 25 F.Supp.2d 175, 180 (S.D.N.Y.1998) (quoting *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1192 (2d Cir. 1996)); *see also Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's London*, 136 F.3d 82, 86 (2d Cir.1998).

■ A contract is not ambiguous when the language in it has "a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *M.H. Segan Ltd. Partnership v. Hasbro, Inc.*, 924 F.Supp. 512, 525 (S.D.N.Y.1996) (internal brackets, quotations, and citations omitted).

■ If the language of a contract is ambiguous, extrinsic evidence of the parties' intent is admissible. *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir.1992). The primary objective in contract construction is "to give effect to the intent of the [contracting] parties as revealed by the language they chose to use." *Bourne v. Walt Disney Co.*, 68 F.3d 621, 629 (2d Cir.1995) (citation omitted), *cert. denied*, 517 U.S. 1240, 116 S.Ct. 1890, 135 L.Ed.2d 184 (1996). To determine intent, the court should look to the contract as a whole and the parties' conduct. *Id.* at 627–29.

■ Summary judgment "is clearly permissible when the language of the contract provision in question is unambiguous." *Nycal Corp. v. Inoco PLC*, 988 F.Supp. 296, 298 (S.D.N.Y.1997) (citing *inter alia Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, 31 F.3d 113, 115 (2d Cir.1994)), *aff'd*, 166 F.3d 1201 (2d Cir.1998); *see also MG Refining*, 25 F.Supp.2d at 180 (stating that "'construction of a contract is appropriate if the meaning of the language is clear, considering all the surrounding circumstances and undisputed evidence of intent, and there is no genuine issue as to the inferences that might reasonably be drawn from the language'") (quoting *Sharkey v. Ultramar Energy Ltd.*, 70 F.3d 226, 230 (2d Cir.1995)). Summary judgment is also appropriate, however,

> when the language is ambiguous and there is relevant extrinsic evidence, but the extrinsic evidence creates no genuine issue of material fact and permits interpretation of the agreement as a matter of law.

*Nycal*, 988 F.Supp. at 299 (cited with approval in *Pulaski Materials Co. v. Milestone Materials, Inc.*, 35 F.Supp.2d 279, 283 (W.D.N.Y.1998)); *see also Chock Full O'Nuts Corp. v. Tetley, Inc.*, 152 F.3d 202, 204 (2d Cir.1998) (holding that "[n]otwithstanding the existence of contractual ambi-

courts have "adopted a flexible approach to choice of law, focusing on the law of the state with the most significant interest in the dispute." *Parenteau v. Kim*, No. 97 Civ. 8863, 1998 WL 740778, at *2 n. 1 (S.D.N.Y. Oct. 22, 1998). For contract claims, New York applies a "center of gravity or grouping of contacts approach." *Id.*

Here, defendants' principal place of business is Colorado. Plaintiffs do not appear to have a principal place of business, although they communicated with defendants from both Chicago and New York. Although neither party has declared where the LOI was actually signed, it is undisputed that the parties' face-to-face negotiations took place in New York. Based on this analysis, and in view of the parties' reliance on New York law, the Court will apply New York law. *Id.* (citing *inter alia Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 137 (2d Cir.1991)).

guities, summary judgment may be granted if .... [the non-movant fails] to show that there is any issue of material fact for trial; however the ambiguity were resolved, the movant would prevail").

## B. *Application*

### 1. *Ambiguity*

■ In *Space Imaging I*, I concluded that the "LOI is ambiguous as to the parties' intent with respect to the right of first refusal provision." 1998 WL 190356, at *2. Indeed, the LOI admits of more than one interpretation when viewed objectively. I therefore reject plaintiffs' contention that the Provision is enforceable because it is unambiguous. The Provision may be unambiguous standing alone, but it is ambiguous in the context of the entire LOI. Because the LOI is ambiguous, extrinsic evidence of the parties' intent is admissible, and the disposition of these motions turns on the question of what the parties intended when they entered into the LOI.

Plaintiffs do not dispute that the provisions of the LOI concerning the parties' intent to negotiate an RAA and ROCPA were nonbinding. Rather, plaintiffs contend that the Provision was separate from the rest of the LOI, and that inclusion of the Provision in the LOI created a presently enforceable right of first refusal even though the LOI itself was considered nonbinding.

There is a dearth of case law on the issue of whether one provision of an otherwise nonbinding preliminary agreement can be enforceable. Plaintiffs cite only two cases to support this proposition. *See Schwanbeck v. Federal–Mogul Corp.*, 412 Mass. 703, 592 N.E.2d 1289 (Mass.1992); *Lexington Inv. Co. v. Southwest Stainless, Inc.*, 697 F.Supp. 139 (S.D.N.Y.1988). I discuss each case in turn.

In *Schwanbeck*, the Massachusetts Supreme Court affirmed the trial and appeals courts' conclusion that a right of first refusal provision contained in an agreement to negotiate in good faith was enforceable, even though the agreement's obligation to negotiate in good faith was *un* enforceable. 592 N.E.2d at 1291–92. The court so held because the language and placement of the right of first refusal provision made it *clear* that the parties intended to be bound by that provision. *Id.* at 1292 n. 2.

In *Lexington*, plaintiff corporation sued defendant corporation for violating the terms of a LOI. 697 F.Supp. at 140. Plaintiffs filed suit in New York despite the fact that the LOI stated that all disputes arising under the LOI had to be filed in Texas. Defendants moved to have the case transferred to Texas. Applying Texas law, the court granted the motion to transfer and decided to enforce the parties' forum selection clause even though the LOI contained a numbered paragraph stating that it was nonbinding. *Id.* at 141–44. Again, the placement of the provision persuaded the court that the parties intended the forum selection clause to be enforceable. *Id.* at 142–43. Moreover, the court determined the parties' intent based solely on the "four corners" of the LOI. *Id.* at 142.

These cases are inapposite. Unlike the agreements in *Schwanbeck* and *Lexington*, the LOI at issue is ambiguous. Thus, the Court must go beyond the four corners of the LOI to determine the parties' intent.

### 2. *Intent*

The language of the LOI read as a whole, the history of the negotiations, and other extrinsic evidence demonstrate that there is no genuine issue of material fact on the question of what the parties intended. I address each of these items in turn.

### a. *Language*

The language of the LOI as a whole demonstrates that the parties did not intend to be bound, even by the Provision. First, the LOI contains, both at the outset and in the bullet point provisions, express language as to the nonbinding nature of the document. The LOI states *inter alia* that it is "not a binding agreement" (first paragraph); it is "written to memorialize

our discussions thus far and to serve as a basis to go forward" (first paragraph); the "offer described herein is subject to successful conclusion of negotiations" (paragraph 2); the "key points of a future series of agreements . . . are" (paragraph 3); the LOI "does not create any binding relationship, contract, joint venture, partnership, trust or agency" (bullet point 14); and "neither party has committed to any exclusivity regarding dealing with the other during negotiations" (bullet point 15). There is nothing to suggest in the LOI that this language did not apply to the Provision.

Second, the parties did not include any language in the LOI that demonstrates that the Provision or any other part of the LOI was to be treated differently or separately. Had the parties intended for the Provision or any other portion of the LOI to be enforceable, they would have explicitly said so. The opening paragraphs of the LOI, which are *not* bullet point provisions, expressly state that the LOI is not intended to be a binding agreement. If the parties had expected or wanted certain provisions to be enforceable they would have, at the very least, done something to set apart such provisions from the rest of the LOI. For instance, the parties could have added, but did not add, the following to the Provision: "Notwithstanding any other statement in this LOI, plaintiffs will have a right . . . . "

Third, although the Provision is placed among the last five bullet points of the LOI, which arguably relate to the parties' present understandings as opposed to future circumstances, these bullet points are not separated or distinguished in any way. Indeed, these bullet points, like all the other bullet points in the LOI, are introduced by the opening paragraphs of the LOI. These introductory paragraphs, particularly the third introductory paragraph, appear to apply to all the bullet points that follow.

· Plaintiffs make one argument concerning the language of the LOI that warrants discussion. Plaintiffs contend that the Provision can only be interpreted as granting them a present right because the Provision otherwise would be rendered meaningless. *See Gonzalez v. Don King Productions, Inc.*, 17 F.Supp.2d 313, 317 (S.D.N.Y.1998) (stating that interpretations that tend to render a contract's "express price terms meaningless" should be avoided) (citing *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir.1992), and Restatement (Second) Contracts § 203 (1979)). I reject the argument.

As an initial matter, plaintiffs are mistaken that the Provision would be rendered meaningless under any interpretation other than their own. The third introductory paragraph, for example, refers to a "future series of agreements"; the Provision could have been one of these agreements to be negotiated in the future. Moreover, the Provision could be interpreted to apply even after the parties had executed an RAA or ROCPA. For instance, even though the LOI contemplated the negotiation of an RAA for the maximum image sensor time per month (300 minutes), the parties could have executed an agreement for less than that amount of time, and a right of first refusal could have applied to remaining time in the Territory. (Copple ¶¶ 4–5). In addition, the LOI expressly contemplated certain "non-exclusive rights" to which the alleged right of first refusal might also have applied. (*Id.* ¶ 6). Finally, it is undisputed that "the IKONOS program has always revolved around at least two" IKONOS satellites, thereby doubling the eventual transmission time and prospects for competition in any one communications cone. (*Id.* ¶ 7). It is possible that the right of first refusal, if included in the RAA or ROCPA, would apply to a future IKONOS satellite. (*See* Fotis Tr. at 56–58, 64–65 (admitting that there might be an IKONOS 2 and, if there were, that plaintiffs "would be the first ones [defendants] would come to . . .

[and that] hopefully [plaintiffs] would sign for IKONOS 2")).

Even if the Provision were rendered meaningless, plaintiffs' argument still fails. The concept that provisions of a contract must be interpreted in such a manner that they are not rendered meaningless is based on the premise of a binding and enforceable contract. If the parties did not intend to be bound by the LOI, and the LOI was not a binding and enforceable contract, it makes no difference that the document contains provisions that arguably are rendered meaningless. If anything, the fact that there are seemingly meaningless provisions in the LOI demonstrates further that there was no meeting of the minds as to the enforceability of the Provision, for the Provision contradicts the opening paragraphs and other express language in the LOI.

For all these reasons, the language of the LOI as a whole demonstrates an intent by the parties not to be bound by any of the LOI's provisions.

#### b. *History of the Negotiations*

The parties' negotiations and exchange of drafts provide additional, compelling proof that there was no mutual intent to be bound by the Provision.

First, Draft One of the LOI, which was drafted by plaintiffs, did not contain a right of first refusal. Nor, for that matter, did Draft Two. Hence, neither side contemplated a right of first refusal at first. Second, although plaintiffs introduced the Provision in Draft Three, defendants promptly responded with a proposal to add to the LOI the language that "[t]his letter is not a binding agreement." This series of events strongly suggests that there was no mutual intent to be bound by the Provision.

#### c. *Other Extrinsic Evidence*

Finally, in addition to context and the negotiation history, the other extrinsic evi-

dence in the record demonstrates that there is no genuine issue of material fact as to the parties' intent. First, the declarations of the parties demonstrates that there was no intent to be bound. Second, the Provision was not supported by consideration.

##### 1) *Declarations by the Parties*

Defendants expressly declare that it was not their intent to be bound by the LOI in general or the Provision in particular. Defendants point to their own conduct as proof. Indeed, defendants added language to the LOI to make it clear that it was not binding. Defendants also explicitly told plaintiffs that the LOI was not a binding agreement in a meeting prior to the execution of the document.

Plaintiffs, on the other hand, provide no extrinsic evidence as to intent. The only evidence they submit is Fotis's deposition testimony and the LOI itself. Fotis, however, never states that the parties mutually intended to be bound by the Provision. Rather, he merely explains how valuable a right of first refusal would be to *plaintiffs*. As to the LOI itself, plaintiffs mistakenly assume that the mere existence of the Provision somehow proves that the parties mutually intended to be bound by it. Plaintiffs' reasoning, however, is circular. In essence, plaintiffs contend that they were entitled to a right of first refusal because the LOI contains a right of first refusal—it is enforceable because it is enforceable. The mere fact that the Provision exists, however, does not prove that the parties intended for it to be an enforceable right. Plaintiffs provide nothing to rebut defendants' evidence that there was no mutual intent to be bound.

##### 2) *Consideration*

Finally, the unrebutted extrinsic evidence demonstrates that the Provision was not supported by consideration.[2] Plaintiffs admit through Fotis's testimony that the right of first refusal was extremely important and valuable. A reasonable factfinder

---

**2.** It is a fundamental principle of contract law that "consideration is a necessary prerequi-

site to a valid contract." *In re Bennett,* 149 B.R. 16, 19 (N.D.N.Y.1993). Moreover, noth-

could only conclude that had *defendants* intended to be bound by a right of first refusal, they would have bargained for some tangible consideration for it. (*See* Copple Dec. ¶ 2 ("[Defendants] received no consideration for the [LOI] and would not, under any circumstances, have bound itself exclusively to Mr. Ducas for such an important regional affiliation without receiving some significant benefit in exchange.")). Defendants, however, received no tangible consideration for the Provision. The lack of consideration further evidences the lack of any *mutual* intent to be bound by the Provision. Plaintiffs' one-sided hope or desire was not enough.

Accordingly, in view of the LOI as a whole, the history of negotiations, the parties' statements, and the fact that the Provision is not supported by consideration, no reasonable juror could conclude that defendants intended to confer a right of first refusal on plaintiffs for the period from September 22, 1997 through December 31, 1997. (*See* Copple Dec. ¶¶ 2–7; Mueller Dec. ¶¶ 4–7 & Exs. A–D). Nothing in the record demonstrates any willingness on the part of defendants to grant plaintiffs such an extraordinary right, and plaintiffs submit *no* evidence to prove that the parties mutually intended to be bound by the Provision.

Defendants' motion for summary judgment is therefore granted and plaintiffs' complaint is dismissed with prejudice.[3] Because I conclude as a matter of law that

ing is consideration " 'that is not regarded as such by both parties.' " *Rose v. Elias*, 177 A.D.2d 415, 576 N.Y.S.2d 257, 258 (1st Dep't 1991) (quoting *McGovern v. City of New York*, 234 N.Y. 377, 388, 138 N.E. 26 (Ct.App. 1923)). While the parties do not address consideration in their briefs, the lack of consideration is another reason that the Provision is unenforceable as a matter of law. After all, "a right of first refusal must be supported by consideration or its equivalent." Corbin § 11.3 at 470.

**3.** In addition to specific performance and breach of contract, plaintiffs also assert a claim of "fraudulent misrepresentation." (*See* Cmplt. ¶¶ 74–85). To state a claim of fraudulent misrepresentation, plaintiffs must demonstrate that: (1) defendants made a ma-

the Provision was not an enforceable right, I do not reach the parties' arguments concerning plaintiffs' ability to match or better the Marcopoulos Deal.

### CONCLUSION

For the reasons stated herein, plaintiffs' motion is denied, defendants' motion is granted, and plaintiffs' complaint is dismissed with prejudice. The parties shall appear for a conference on April 9, 1999 at 11:00 A.M. at 500 Pearl Street to discuss the only claims that remain in the case, defendants' counterclaims.

SO ORDERED.

terial false representation; (2) defendants intended to defraud the plaintiffs thereby; (3) plaintiffs reasonably relied upon the representation; and (4) plaintiffs suffered damage as a result of such reliance. *The Independent Order of Foresters v. Donald, Lufkin & Jenrette, Inc.,* 157 F.3d 933, 940 (2d Cir.1998).

Based on the parties' submissions, no reasonable juror could conclude that defendants made any false representation to plaintiffs about a right of first refusal. Even if a reasonable juror could so conclude, any reliance on that misrepresentation by plaintiffs would not be reasonable considering the fact that there was not a valid contract for a right of first refusal. Accordingly, plaintiffs' fraudulent misrepresentation claim fails as well.