OMNI BERKSHIRE CORP.
et al., Plaintiffs,

v.

WELLS FARGO BANK,
N.A., Defendant.

No. 02 Civ. 7378(DC).

United States District Court,
S.D. New York.

Feb. 25, 2004.

Baker Botts L.L.P., By: Neil P. Sirota, New York City, Van H. Beckwith, Dallas, TX, for Plaintiffs.

Sidley, Austin, Brown & Wood, LLP, By: James J. Sabella, John J. Lavelle, New York City, Stephen C. Carlson, Jonathan I. Katz, Chicago, IL, for Defendant.

## MEMORANDUM DECISION

CHIN, District Judge.

In this case, plaintiffs borrowed $250 million in 1998 (the "Loan") pursuant to an agreement (the "Agreement"), secured by five hotels. The Agreement required plaintiffs to obtain and maintain certain insurance, including "comprehensive all risk insurance" on the hotels as well as "such other reasonable insurance" as the lender might request. Prior to September 11, 2001, plaintiffs did not have separate insurance to cover damage from terrorist acts, for damage from terrorist acts was included in the "all risk" coverage. After September 11, 2001, however, insurance companies began excluding terrorist attacks from their "all risk" policies. Terrorism insurance was still available, principally in the form of separate, stand-alone policies at a substantial additional expense. Here, the servicing company for the Loan requested that plaintiffs obtain additional terrorism insurance, but plaintiffs refused, citing the cost. This lawsuit followed.

Two issues are presented: First, whether plaintiffs' obligation to maintain "comprehensive all risk insurance" requires it to continue to maintain terrorism coverage in the post-September 11, 2001 world, now that terrorism insurance is typically excluded from "all risk" policies; and second, assuming no such obligation existed, whether it was reasonable for the servicing company to require plaintiffs to obtain ter-

rorism insurance under the "other reasonable insurance" clause.

The case was tried to the Court without a jury on July 21 and 22, 2003. For the reasons set forth below, I conclude that plaintiffs were not required to purchase terrorism insurance by virtue of the "all risk" clause, but that the servicing company acted reasonably in requesting additional terrorism insurance pursuant to the "other reasonable insurance" clause. Hence, judgment will be entered in favor of defendant. My findings of fact and conclusions of law follow.

## BACKGROUND

### A. The Facts

#### 1. The Loan

Plaintiffs Omni Berkshire Corp., HCD Chicago Corp., HCD Houston Corp., HCD Dallas Corp., TRT Development Co. Dallas, and HCD Operating Co., L.P. (collectively, "Omni") own or operate certain hotels in the United States, Canada, and Mexico. On August 28, 1998, Omni entered into the Agreement with Secore Financial Corp. (the "Lender"), for the Loan and Omni borrowed $250 million. (Ex. 1; Tr. 33–36).[1] The Loan was secured by five of Omni's hotels, located in New York City, Chicago, Houston, Dallas, and Irving, Texas. The outstanding balance of the Loan, at the time of trial, was approximately $230 million. (Ex. 247). The estimated full replacement costs of the pledged properties was $349 million. (Ex. 13). When the Loan closed, the five hotels were worth approximately $500 million. (Ex. 3, at p. S-54; Tr. 83). The hotels were cross-collateralized, meaning that the lender could look to all five properties for repayment of the Loan. (Tr. 70, 83–84).

---

1. References to "Ex." are to the joint trial exhibits received at trial. References to "Tr." are to the transcript of the trial on July 21 and 22, 2003.

During the negotiations over the terms of the Loan, the subject of terrorism was never discussed. (*Id.* 40, 87).

Defendant Wells Fargo Bank, N.A. ("Wells Fargo") is the servicing company for the Loan, and is charged with administering the Loan and enforcing the terms of the Agreement. Wells Fargo succeeded Wachovia Bank ("Wachovia"), the original servicing company.

The Loan is one of a number of loans, totaling some $1.8 billion in principal amount, that have been securitized and offered to the public. Shares—or "certificates"—have been sold to members of the public pursuant to a prospectus. (Ex. 23; Tr. 218).

### 2. *The Agreement*

Section 6.1(a) of the Agreement requires Omni to "obtain and maintain" insurance for Omni and the five hotels. It requires eight specific listed coverages, including:

> comprehensive all risk insurance on the [five hotels] ... in an amount equal to one hundred percent (100%) of the "Full Replacement Cost," ... but the amount shall in no event be less than the outstanding principal balance of the Loan.... In addition, [Omni] shall obtain ... flood hazard insurance ... and ... earthquake insurance.

(Ex. 1, § 6.1(a)(i)). Although the Agreement contains some 19 pages of definitions, it does not define the phrases "comprehensive all risk insurance" or "all risk." (*See id.,* § 1.1 (definitions)). The Agreement does not specifically refer to terrorism insurance or acts of terrorism. (*Id.; see* Tr. 250).

Section 6.1(a) also requires Omni to obtain and maintain:

> upon sixty (60) days' written notice, such other reasonable insurance and in such reasonable amounts as Lender from time to time may reasonably request against such other insurable hazards

which at the time are commonly insured against for property similar to [each of the five hotels] located in or around the region in which the [hotel] is located. (*Id.,* § 6.1(a)(ix)).

### 3. *Omni's Insurance*

Since the Loan's inception, Omni has maintained comprehensive all risk insurance, at its own cost and expense. For 2002–2003, the annual premium for the all risk policy was approximately $550,000, and for the 2003–2004 time period, the annual premium was just under $500,000. (Tr. 38–40; Exs. 14, 24). The comprehensive all risk policies obtained by Omni up until March 1, 2002, did not contain an exclusion for terrorist acts. (*E.g.,* Exs. 33, 202). In fact, Omni's policy at the time the Agreement was signed provided that "damage done by terrorists ... is insured." (Ex. 33, at 000507; *see* Tr. 85).

As witnesses for both sides agreed, before 9/11, "all risk" policies covered damage caused by acts of terrorism; there was no exclusion for acts of terrorism. (Tr. 45–47, 135, 276, 322). Prior to 9/11, terrorism insurance was "a nonissue." (*Id.* 106). After 9/11, however, the insurance landscape changed: insurance companies, in general, began excluding damage from terrorist attacks from their "all risk" policies. (*Id.* 45, 48, 106, 136, 295–96). Terrorism insurance was available after 9/11, but it had to be obtained in the form of separate, stand-alone policies, and the premiums were high.

In the fall and summer of 2002 time frame, Omni obtained quotes for insurance for the hotels at more than a million dollars. Omni believed the prices were exorbitant and was unwilling to spend that much money. (*Id.* 58, 65, 66–67, 75–76, 121–24, 138, 153; Exs. 220, 222).

On March 1, 2002, when Omni renewed its all risk policy, the renewed policy con-

tained an exclusion for acts of terrorism. (Tr. 49–50; Ex. 14, at p. U–GU–592).[2] Omni did not purposefully seek a policy that excluded terrorism coverage; when Omni sought to purchase insurance for the 2002–2003 time period by requesting bids, all of the proposed policies were submitted with terrorism excluded. Omni was unable to find an "all risks" policy that included coverage for acts of terrorism, with the exception of the limited $25 million in coverage. (Tr. 44–50; see Ex. 14).

#### 4. *The Dispute*

By letter dated July 11, 2002, when it was still the servicing company for the Loan, Wachovia advised Omni that Omni's insurance did not comply with the Agreement because the insurance excluded terrorist acts. (Tr. 42–43; Ex. 73). By letter dated July 26, 2002, Omni responded that it did not agree that the Agreement required terrorism insurance. (Tr. 52–53; Ex. 79). Nonetheless, Omni also stated that it had obtained quotes for terrorism insurance policies and determined that "such policies come at an *extremely* high cost." (Ex. 79 (emphasis in original)).

On August 5, 2002, Michael G. Smith, Omni's general counsel, spoke by telephone with Scott Husselbee of Wachovia about the insurance issue. (Tr. 54–55). Husselbee stated that he had not read the Agreement, that Wachovia had to tend to 9,000 loan agreements, and that Wachovia was unable to meet with all 9,000 borrowers to discuss the issue of terrorism insurance. (*Id.* 54–56).

The parties engaged in further discussion and exchanged additional correspondence. (*See, e.g.*, Exs. 35, 80, 82). After several months, Wells Fargo offered to accept less than the full replacement cost of the five hotels ($349 million) and even

less than the loan balance ($230 million): it agreed to accept $60 million in coverage. (Tr. 234–36; see Exs. 13, 247). Wells Fargo thought it had reached an agreement with Omni, but was then advised by Omni representatives that the owner of Omni did not want to spend the money for terrorism insurance. (Tr. 236–37). Omni commenced this lawsuit on September 13, 2002.

#### 5. *The TRIA*

On November 26, 2002, after this action was filed, the Terrorism Risk Insurance Act of 2002, Pub.L. 107–297, 116 Stat. 2322 (the "TRIA"), was signed into law. The TRIA prohibits exclusions for certain "Acts of Terrorism" from insurance policies for a limited time period during which insurers were required to notify their insured of the availability of and rates for insurance coverage for "Acts of Terrorism." The TRIA, however, defined an "Act of Terrorism" as an act of terrorism causing damage within the United States or to certain United States property located outside the country, "committed by an individual or individuals acting on behalf of any foreign person or foreign interest." *Id.* at 2323–24.

Hence, the TRIA does not apply to acts of domestic terrorism. Moreover, although it requires that insurance be made available for acts of terrorism committed by individuals acting on behalf of a foreign interest, it does not place any restrictions on the amount that insurers can charge for such insurance.

#### 6. *All Risk Policies and Terrorism Insurance*

■ As noted, the Agreement does not define the phrases "comprehensive all risk

---

**2.** There was a limited exception to the exclusion. If there was $25 million or less in damages from an act of terrorism, the dam-

ages were covered. If the damages exceeded $25 million, there was *zero* coverage. (Tr. 50–51, 75, 115–16).

insurance" or "all risk." (*See* Ex. 1, § 1.1 (definitions)). "All risk" insurance is property insurance that covers damage resulting from all risks other than those that are specifically excluded from coverage; if a risk is not specifically excluded, it is deemed covered.[3] Typical exclusions found in "all risk" policies are war, pollution, earthquake, and flood. (Tr. 37–38, 95–96, 99, 294–95). Over time, the standards of the insurance industry have changed in this respect. (*Id.* 104, 166, 250, 324). For example, in the mid to late 1990s, the "Y2K" exclusion was introduced to exclude damages resulting from the failure of computer systems to recognize the year 2000. (*Id.* 97). Another exclusion that has developed in recent years is a mold exclusion, excluding damage caused by mold in buildings. (*Id.* 97, 295). The development of the terrorism exclusion after 9/11 is yet another example of a change in industry standards. (*Id.* 295–96). Over time, "all risk" policies will vary. (*Id.* 104–05, 163).

The cost of terrorism insurance has decreased significantly since 2002. (Tr. 132–33, 177; *compare* Ex. 222 *with* Ex. 256). Many insureds, including a significant number of hotel owners, have purchased stand alone terrorism policies. (Tr. 147–48; Exs. 59, 68). One insurance broker—who corresponded by e-mail with Omni's insurance broker—observed in January 2003:

> Though it has been difficult to get an accurate reading as to the take up rate on TRIA, it is our belief that it is running [at] least 30–35%. A significant proportion of the flow is lender driven and it is not at all unusual to be a requirement on funding of hotels. We have, in fact, a significant number of hotel owners for whom we have written stand alone terrorism coverage.

(Ex. 59). Two months later, the same broker wrote an e-mail to Omni's broker, who had been seeking information to address Omni's insurance situation, stating, in part:

> The fact that your client [Omni] does not want to buy terrorism insurance is worrisome to me, but more so, I am sure, for their lender. No one wants to buy anything that costs more than it did before—in this case, it used to cost nothing. But the risk has clearly heightened. Are they denying this?
>
> Rather than helping them keep fighting the lender (this has been going on for months—they've bought enough time), perhaps we should look at ways to alleviate the whole issue—and get them a quote they can accept. It will NOT be nothing. It WILL be something. But right now, they are spending hours and legal fees for what? No cover?
>
> . . .
>
> The hospitality business is under significant pressure and lenders know that another terrorist attack will make matters worse in terms of revenue flow (debt repayment). They have a fiduciary responsibility to try to secure the debt payment as best they can. Your client not only has lenders but shareholders they have to consider . . . .

(Ex. 68).

As of July 8, 2003, Wells Fargo serviced 3632 loans. Of these, 2309 had terrorism insurance. (Ex. 332). In situations where Wells Fargo was itself the lender, it determined whether to require terrorism insur-

---

**3.** The name "all risk" is a misnomer, for an all risk policy does not cover *all* risks of loss, but only risks that are not specifically excluded. (Tr. 320–21, 341). *See Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 234 (3d Cir.2002) ("'[I]n the insurance industry, 'all risks' does not mean 'every risk.' '"); Barry R. Ostrager & Thomas R. Newman, *Insurance Coverage Disputes* § 21.04, at 1238 (12th Ed.2004).

ance on a case-by-case basis. (Tr. 226–27). Where Wells Fargo is the servicer and not the lender, it has proceeded on a categorical basis, requiring terrorism insurance across-the-board. (*Id.* 228). Wells Fargo has treated the situations differently because when it is the lender, its obligation is only to itself as lender, whereas in the situations where, as here, the loan is securitized, it has a fiduciary obligation to third parties—it must protect the interests of the certificate holders. (*Id.* 229).

During the pendency of this case, Omni obtained a quote for $60 million in terrorism coverage (both TRIA certified and non-certified) for the five hotels at a price of $316,000 for a year. (Tr. 72–73, 76–77; Ex. 227). This price was reasonable. (Ex. 334, ¶¶ 37–44; Ex. 335, at 4). Nonetheless, $316,000 is approximately 63% of the cost of Omni's all risk policy. (*Id.* 130). In addition, if the insurance is required, the cost would continue through the life of the Loan, *i.e.,* until 2008. (*Id.* 181).

### B. Prior Proceedings

Omni commenced this action on September 13, 2002, seeking a determination that it was not required under the Agreement to obtain terrorism insurance. It immediately moved for a temporary restraining order and preliminary injunction to prevent Wells Fargo from "force-placing" the insurance. The motion was withdrawn by agreement of the parties.

Thereafter, the action was essentially held in abeyance as the parties engaged in discussions to resolve the matter and awaited action by Congress on the proposed terrorism legislation, which eventually was passed as the TRIA. When discussions between the parties failed, Omni renewed its motion for a preliminary injunction on March 19, 2003. By Memorandum Decision entered April 17, 2003, I concluded that Omni had not demonstrated a likelihood of success, but I granted the motion on other grounds. *Omni Berkshire Corp. v. Wells Fargo Bank, N.A.,* No. 02 Civ. 7378(DC), 2003 WL 1900822 (S.D.N.Y. April 17, 2003).

The parties completed discovery. The case was tried on July 21 and 22, 2003. At the conclusion of the trial, I reserved decision. The parties thereafter submitted post-trial briefs.

### DISCUSSION

The two matters for consideration are (a) the "all risk" clause and (b) the "other insurance" clause. I address each in turn.[4]

### A. The "All Risk Clause"

The first issue is whether Omni was required, by virtue of the "all risk" clause of the Agreement (Ex. 1, § 6.1(a)(i)), to purchase terrorism coverage after insurance companies started excluding acts of terrorism from "all risk" policies after 9/11. I hold that it was not.[5]

Under New York law,[6] the key to contract interpretation is "the parties' reasonable expectations." *Sunrise Mall Assocs. v. Import Alley of Sunrise Mall, Inc.,* 211 A.D.2d 711, 621 N.Y.S.2d 662, 663 (2d

---

4. A threshold issue is the burden of proof: it is unclear whether Omni or Wells Fargo bears the burden of proof in this case. I need not decide the issue, for this case does not turn on who bears the burden of proof.

5. There is little case law on point. Two decisions involve similar situations, but they provide little guidance as they addressed only preliminary issues and were not final decisions on the merits. *See Four Times Square Assocs., L.L.C. v. Cigna Invs., Inc.,* 306 A.D.2d 4, 764 N.Y.S.2d 1 (1st Dep't 2003); *Philadelphia Plaza–Phase II v. Bank of America Nat'l Trust & Sav. Assoc.,* No. 3745, 2002 WL 1472337 (Pa. Ct. Comm. Pleas June 21, 2002).

6. The Agreement is governed by New York law. (Ex. 1, § 10.3(A)).

Dep't 1995); *see VTech Holdings Ltd. v. Lucent Techs., Inc.,* 172 F.Supp.2d 435, 441 (S.D.N.Y.2001) ("the essence of contract interpretation ... is to enforce a contract in accordance with the true expectations of the parties in light of the circumstances existing at the time of the formation of the contract") (internal quotations and citation omitted). To give effect to the parties' reasonable expectations, the court must "determine the parties' purpose and intent." *Sunrise Mall,* 621 N.Y.S.2d at 663. It must do so by looking at the language the parties chose to use, the contract as a whole, and the conduct of the parties. *Id.; Space Imaging Europe, Ltd. v. Space Imaging L.P.,* 38 F.Supp.2d 326, 334 (S.D.N.Y.1999).

■ If the language of a contract is ambiguous, the court may look to extrinsic evidence of the parties' intent. *Space Imaging,* 38 F.Supp.2d at 334. Extrinsic evidence may include evidence of trade usage. *United States Naval Inst. v. Charter Comm., Inc.,* 875 F.2d 1044, 1048–49 (2d Cir.1989) ("Usage and customs may be proved ... to aid in interpretation of the words of the parties.") (quoting 3 A. Corbin, *Corbin on Contracts* § 556, at 240–42 (1960)); *Record Club of America, Inc. v. United Artists Records, Inc.,* No. 72 Civ. 5234(WCC), 1991 WL 73838, *10 (S.D.N.Y. April 29, 1991) ("When a trade usage is widespread, there is a presumption that the parties intended its incorporation by implication, unless the contract language negates it.").

A contractual provision should be read so as to avoid rendering any part of the contract superfluous or without effect. *Eastman Kodak Co. v. STWB Inc.,* No. 01 Civ. 5124(JGK), 2002 WL 31465798, *16 (S.D.N.Y. Nov.4, 2002). In addition, "words should be given the meanings ordinarily ascribed to them and absurd results should be avoided." *Newmont Mines, Ltd. v. Hanover Ins. Co.,* 784 F.2d 127, 135

(2d Cir.1986) (quoted in *World Trade Center Props., L.L.C. v. Hartford Fire Ins. Co.,* 345 F.3d 154, 184 (2d Cir.2003)).

Here, the Agreement is ambiguous, for it does not define "all risk" or "comprehensive all risk insurance." In fact, the term "all risk" is a misnomer, for an "all risk" policy does not cover "all risks" but only risks that are not specifically excluded. The Agreement does not spell out the parameters of the required "all risk" insurance, and the Agreement itself makes no reference to terrorism or terrorism insurance. Accordingly, to ascertain the intent of the parties, I may look not only to the language of the Agreement but to extrinsic evidence.

There is little in terms of extrinsic evidence. As the parties agree, in 1998, when the Agreement was executed, all risk policies covered acts of terrorism because terrorism was not specifically excluded. When the parties negotiated the Agreement, terrorism insurance was a "nonissue," and there was no discussion of terrorism insurance. Hence, there is no direct evidence of what the parties intended because the subjects of terrorism insurance and whether the requisite "all risk" insurance had to cover terrorism were not discussed.

Nonetheless, there is some circumstantial evidence as to what the parties intended. The parties did not define "all risk" insurance at least in part because there was, and still is, a general understanding in the insurance industry as to the meaning of "all risk" insurance. It was commonly understood that the standard "all risk" policy had evolved over time and that it could continue to evolve over time. The Y2K, mold, and terrorism exclusions are examples of exclusions that are now commonly found in "all risk" policies that did not exist some years ago.

Under these circumstances, if the parties had intended to require Omni to maintain for the life of the Agreement "all risk" insurance in the form that existed in August 1998, *i.e.*, that included terrorism insurance, they surely would have said so. Indeed, they would have re-written § 6.1(a)(i) of the Agreement to read in words or substance that Omni was required to maintain:

> comprehensive all risk insurance on the [five hotels] ... in an amount equal to one hundred percent (100%) of the "Full Replacement Cost," *in the form that comprehensive all risk insurance exists today, i.e., August 28, 1998.*

(Ex. 1, § 6.1(a)(i) (underlined language added)). That the parties did not include such or similar language suggests that the parties intended to require only what the industry generally accepted—knowing that the generally accepted all risk policy might evolve over time. *See Karabu v. Pension Benefit Guaranty Corp.*, No. 96 Civ. 4960(BSJ), 1997 WL 759462, *13 (S.D.N.Y. Dec.10, 1997) (holding that reference in contract to "F.A.A.-approved maintenance program" referred to program "as it evolves over time, rather than as fixed on any particular date," because the industry understood the phrase "to refer to an evolving standard").

Other language in the Agreement also supports this interpretation. When the parties required Omni to maintain all risk insurance, they specifically required Omni to also obtain coverage for flood and earthquake. These were standard exclusions from all risk policies. Hence, when the parties wanted to deviate from the standard all risk policy to include coverage for risks traditionally excluded, like flood and earthquake, they included language in the Agreement to that effect. No such language was included for terrorism insurance. Again, at that time terrorism insurance was a "non-issue," but when the parties wanted to depart from the usual practice with respect to all risk coverage, they did so explicitly.

Finally, this is the only interpretation that makes sense. The argument that the parties intended a rigid, precise definition of "all risk" simply is not logical, for otherwise they would have included a definition of "all risk" insurance. Moreover, in § 6.1(a)(i), clearly the parties were bargaining for what was commercially reasonable and accepted in the trade—the common, everyday understanding of "all risk" and not some specific definition that deviated from the generally accepted. Indeed, after 9/11, Omni was unable to purchase an "all risk" policy without a terrorism exclusion. In addition, as discussed below, there was another provision of the Agreement to cover additional insurance that the lender might request.

Accordingly, I hold that the parties did not intend to require Omni to forever maintain "all risk" insurance precisely as it existed in 1998. Hence, in 2002, Omni was required only to purchase the generally accepted "all risk" policy, and it was not required by § 6.1(a)(i) to purchase a separate terrorism insurance policy.

## B. The "Other Insurance" Clause

■ Even assuming the "all risk" clause did not require Omni to purchase a stand alone terrorism policy, the issue remains whether Wells Fargo acted reasonably in requiring Omni to purchase terrorism coverage under the "other insurance" clause of the Agreement. (Ex. 1, § 6.1(a)(ix)). I conclude that Wells Fargo acted reasonably in requiring Omni to obtain, as "other reasonable insurance," an additional $60 million in terrorism coverage.

First, Wells Fargo's concern that Omni's hotels are at risk is, unfortunately, reasonable. In the World Trade Center attacks on 9/11, one hotel was destroyed and two others were damaged. (Tr. 81–82). Omni

itself has taken steps to upgrade security at its hotels. (Ex. 235; Tr. 82). The five hotels in question are located in New York, Chicago, and Texas, and surely there is some risk that they could be targeted. The Omni hotel in New York, for example, is located near a number of high-profile buildings. The Court also takes judicial notice of the bombing of a Marriot hotel in Jakarta, Indonesia, in August 2003, which resulted in at least 14 deaths and injuries to 150 others. (*See* Def. Post–Trial Mem., Ex. B).

Second, the record contains substantial proof that the owners of many hotels and other commercial properties have purchased terrorism insurance. (*See* Exs. cited at Def. Post–Trial Mem. at 11–12). These include the Marriott hotels, including hotels in Manhattan, Dallas, Houston, Chicago, and San Francisco (Exs. 302, 303, 304, 305; Tr. 246); the Westin hotel in Chicago (Ex. 307); the Omni hotel in the CNN Tower in Atlanta (Garcia Dep. 72–74); the Hilton hotels, including one in Chicago (Ex. 306; Tr. 220); the Boykin Lodging Co. hotels, including one in Chicago (Ex. 308); the Felcor Lodging LP hotels (Tr. 301, at 15); and the Gaylord hotels. (Ex. 309; Tr. 219–20).

Third, the cost of the $60 million in coverage that Wells Fargo agreed to accept is reasonable: approximately $300,000 per year. (Ex. 334, ¶¶ 37–44; Ex. 335, at 4). Indeed, the cost of terrorism insurance has dropped significantly since the months immediately after 9/11.

Fourth, the additional insurance would benefit not only Wells Fargo but Omni as well. As the broker who was consulted by Omni's broker opined: "[Omni's refusal] to buy terrorism insurance is worrisome to me, but more so, I am sure, for their lender.... But the risk has clearly heightened." She continued: "Rather than helping them keep fighting the lender (this has been going on for months—

they've bought enough time), perhaps we should look at ways to alleviate the whole issue—and get them a quote they can accept. It will NOT be nothing. It WILL be something. But right now, they are spending hours and legal fees for what? No cover?" (Ex. 68).

Omni makes a number of arguments in support of its contention that Wells Fargo acted unreasonably, including, among others, the following: Wells Fargo proceeded on a blanket basis rather than on an individualized case-by-case basis; the hotels are cross-collateralized and their value far exceeds the outstanding balance of the loan; the cost of $316,000 for a terrorism policy is still 63% of the cost of an all risk policy; Wells Fargo failed to make a proper demand; and the Court should be looking at events in 2002 rather than at the state of affairs at the time of trial.

I have considered these arguments and they are rejected. The short answer is simply that in the post–9/11 world when so much more is at risk, it was reasonable for Wells Fargo to request, on behalf of its certificate holders, that Omni provide an additional $60 million in insurance coverage to account for the loss of terrorism coverage created when the insurance industry decided to exclude terrorism from all risk policies.

## CONCLUSION

For the reasons set forth above, judgment will be entered in favor of Wells Fargo dismissing Omni's complaint, with prejudice. Omni shall have thirty days from today to obtain $60 million in terrorism insurance; if it fails to do so, Wells Fargo is free to force-place the insurance at Omni's expense.

SO ORDERED.