NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0246n.06

No. 11-2632

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
*Mar 08, 2013*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| IN RE: SETTLEMENT FACILITY DOW CORNING TRUST | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| DOW CORNING CORPORATION, | ) ) | COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| Interested Party-Appellant, | ) ) | |
| | ) | O P I N I O N |
| v. | ) ) | |
| CLAIMANTS' ADVISORY COMMITTEE, | ) ) | |
| Interested Party-Appellee. | ) ) | |
| | ) | |

BEFORE: BATCHELDER, Chief Judge; McKEAGUE and GRIFFIN, Circuit Judges.

**McKEAGUE, Circuit Judge.** In this case arising from its Chapter 11 reorganization, Dow Corning Corporation seeks Time Value Credits to account for the timing of certain payments it made to the Depository Trust set up for the benefit of breast implant tort claimants. The district court denied Dow's requests except for the instances where the Funding Payment Agreement expressly provides for Time Value Credits. We affirm.

## I. BACKGROUND

**Bankruptcy**

The saga of the Dow Corning silicon breast implant litigation settlement has been told before, so we will not repeat it here. *See, e.g., In re Dow Corning Corp.*, 255 B.R. 445 (E.D. Mich. 2000),

*aff'd and remanded*, 280 F.3d 648 (6th Cir. 2002). Suffice it to say that faced with thousands of lawsuits brought by women who had received silicon breast implants that it manufactured, Dow Corning Corporation ("Dow") filed for Chapter 11 bankruptcy on May 15, 1995. The Bankruptcy Court confirmed the Amended Joint Plan of Reorganization (the "Plan") on November 30, 1999. Much litigation followed, and the Plan finally took effect on June 1, 2004.

The Plan outlines the procedures for resolving breast implant claims. Claimants can choose to settle their claims through a Settlement Facility or litigate their claims against a Litigation Facility. Plan § 5.4. Claims and administrative expenses are paid with monies held in a trust known as the Depository Trust (the "Trust"). Plan § 5.3. The responsibilities of the Trustee are enumerated in a Depository Trust Agreement (the "Trust Agreement"), the first version of which was dated March 27, 2001.

**The Funding Payment Agreement**

Dow's payment obligations are set forth in a Funding Payment Agreement (the "Funding Agreement"), which is the document at the center of this appeal. The Funding Agreement requires Dow to make payments to the Trust[1] up to a maximum aggregate amount of $3.172 billion. Funding Agreement § 2.01. However, the Funding Agreement does not require Dow to make this payment all at once, but spreads out Dow's payment obligations over time. To account for the timing of these payments, the Funding Agreement provides that Dow's funding obligation cannot exceed a net present value of $2.35 billion, calculated as of the Effective Date (June 1, 2004). Funding

---

[1]Although the Funding Agreement uses the term "Settlement Facility," it means the same thing as the Depository Trust. Funding Agreement § 1.03.

Agreement § 2.01. To compare the net present value of Dow's payment stream with the net present value funding cap, all payments—with a possible exception identified below—must be discounted to the Effective Date using a rate of 7% per year compounded annually. Funding Agreement § 2.01; Plan §§ 1.102, 5.3.[2]

The method by which Dow fulfills its payment obligations under the Funding Agreement is remarkably complicated. We need not describe all the details of the Funding Agreement, but several aspects of the Funding Agreement are important for purposes of this appeal.

First, before the Effective Date, Dow made a series of payments totaling $985 million. Funding Agreement § 2.01(a). When executing the Plan, the parties anticipated that appeals might be filed that would delay the Plan's implementation. Plan § 7.4. To prepare for that contingency, the Plan provided that Dow would make an initial payment of $985 million to the Trust to "be held in escrow pending the outcome of the appeal, with any interest accruing thereon to be held as part of the fund." Plan § 7.4. The Plan further provided that these funds could be used for administrative expenses by the Settlement Facility to prepare "to begin processing Claims promptly after the Effective Date." Plan § 7.4. If the confirmation of the Plan was upheld on appeal, these funds would be disbursed to pay claims; if the confirmation of the Plan was overturned on appeal, the remaining

---

[2]"Net Present Value" is defined in the Plan as "the value of an amount of money to be paid in the future or over a period of time that has been adjusted or discounted to reflect that amount as of a single earlier date." Plan § 1.102. The time value of money is a concept central to the Funding Agreement. Simply put, "[t]he time value of money refers to what the value of a dollar amount is today (present value) versus what the value of that same dollar amount will be in X amount of time (future value)." James A. Elfter, *Discounted Cash Flow*, *in The Portable MBA in Finance and Accounting* 103, 103 (Theodore Grossman & John Leslie Livingstone, eds., 4th ed. 2009).

funds would be returned to Dow. Plan § 7.4. Of course, the confirmation of the Plan was in fact appealed, so these payments were made—mostly in 2001—pursuant to a detailed provision in the Trust Agreement. *See* Trust Agreement § 4.01(a). Collectively, they are referred to as the "Initial Payment." Funding Agreement § 2.01(a).

Another important aspect of the Funding Agreement is that Dow's payment obligations are spread out over time. The Funding Agreement creates a series of sixteen "Funding Periods." Funding Agreement § 2.01(b). Each Funding Period lasts exactly one year, and the first begins exactly one year after the Effective Date. Funding Agreement § 2.01(b). Each Funding Period has a corresponding "Annual Payment Ceiling" which determines Dow's maximum payment obligation during that Funding Period. Funding Agreement § 2.01(b). Every three months, the Claims Administrator sends Dow a notification informing Dow of the amount of claims and expenses expected to be paid out in excess of reserves each month. Funding Agreement § 2.02(a). At the end of each month, the Claims Administrator sends Dow a notification informing Dow of the actual claims and expenses paid out in excess of reserves during the preceding month. Funding Agreement § 2.02(b). Dow must promptly pay that amount. Funding Agreement § 2.02(b)(i). Dow is not required to pay more than necessary to cover the actual claims and expenses paid in excess of reserves, Funding Agreement § 2.02(b)(iii), and cannot be required to pay more than the Annual Payment Ceiling. Funding Agreement § 2.02(b)(i).

But the Annual Payment Ceilings really only limit Dow's obligations with respect to cash payments. "Insurance Proceeds"[3] received by Dow before the Effective Date were required to be held in trust by Dow and paid to the Trust 90 days after the Effective Date. Funding Agreement § 2.01(a)(ii). After the Effective Date, Insurance Proceeds are supposed to be paid by the insurers directly to the Trust, and if Dow receives Insurance Proceeds, it must transfer them to the Trust immediately, whether or not they exceed the applicable Annual Payment Ceiling. Funding Agreement §§ 2.01(a)(i), 2.02(c). Of course, requiring Insurance Proceeds to be paid to the Trust without regard to the Annual Payment Ceilings means that Dow's payment of cash and Insurance Proceeds during a Funding Period could exceed the Annual Payment Ceiling. Recognizing this fact, the Funding Agreement provides that when Dow's payments during a Funding Period exceed the applicable Annual Payment Ceiling, Dow receives a credit for the excess amount that operates to reduce the Annual Payment Ceiling in a future funding period.[4] As explained in more detail below, sometimes this credit is applied to the very next Annual Payment Ceiling, and sometimes it is applied to an Annual Payment Ceiling farther in the future.

In addition to crediting the nominal value of the excess amount against a future Annual Payment Ceiling, the Funding Agreement sometimes also expressly credits the time value of the

---

[3]"Insurance Proceeds" is a defined term with a complicated definition in the Funding Agreement. Funding Agreement § 1.02(a). It essentially means funds received from Dow's insurance providers.

[4]Similarly, if the expenditures are less than the Annual Payment Ceiling so that Dow is required to pay less than the Annual Payment Ceiling, the very next Annual Payment Ceiling is increased by the difference, plus 7%. Funding Agreement § 2.02(e).

excess amount. This so-called "Time Value Credit" recognizes that Dow has essentially paid its obligation early, and credits Dow for the timing of the payment as well as the nominal amount. The Time Value Credit is calculated at the rate of 7% per year—the same rate used to calculate the net present value of the total payments for purposes of comparing it with the net present value funding cap.

**Dispute**

The Claims Administrator is charged with the responsibility of adjusting the Annual Payment Ceilings. In 2004, Dow requested that the Claims Administrator adjust the Annual Payment Ceilings to take into account several different payments it had made. Dow claimed it was entitled to Time Value Credits for making these payments early. Specifically, Dow sought Time Value Credits for the following eight payments:

(1) The $985 million Initial Payment, paid mostly in 2001.
(2) $18.4 million paid in 2001 to settle Class 6D claims.
(3) $211,456,278 in Insurance Proceeds that were received by Dow before the Effective Date and paid in June 2004.
(4) $2.9 million paid from Dow's MDL 926 escrow account in June 2004.
(5) $2,180,656 paid from Dow's MDL 926 escrow account in June and September 2004.
(6) $7.2 million paid in June 2004 to Class 4A claimants.
(7) $214,363,369 in Insurance Proceeds that were received by Dow after the Effective Date and paid in June 2004.
(8) $57,736,990 in Insurance Proceeds paid in Funding Period 3.

The Claimants' Advisory Committee ("Committee"), which represents the tort claimants, objected to Dow's request for Time Value Credits for most of these payments. When the Claims Administrator did not grant its request, Dow filed a motion in the United States District Court for

the Eastern District of Michigan requesting that the court require the Claims Administrator to award the Time Value Credits.

The district court found that the Funding Agreement is unambiguous. It determined that Dow is entitled to Time Value Credits only in those instances where the Funding Agreement expressly provides for them. It concluded that if the parties had intended Dow to receive Time Value Credits for particular payments, the Funding Agreement would specifically provide for them. Since the Funding Agreement specifically provides a Time Value Credit for the $214,363,369 in Insurance Proceeds that were received by Dow after the Effective Date and paid in June 2004 (payment number 7 above), the district court found that Dow was entitled to one. It further found that the Funding Agreement specifically provides a Time Value Credit for the $211,456,278 in Insurance Proceeds received before the effective date and paid in June 2004 (payment number 3 above), but only for the period from the date of payment until the beginning of Funding Period 1. The Funding Agreement does not specifically provide a Time Value Credit for the other payments, so the district court denied Dow's request for Time Value Credits for these payments. Unsatisfied with this outcome, Dow appealed the district court's order.

## II. ANALYSIS

### A. Standard of Review

We apply principles of contract interpretation when interpreting a confirmed bankruptcy plan. *See In re Dow Corning Corp.*, 456 F.3d 668, 676 (6th Cir. 2006). New York law governs our interpretation of the Plan and related documents. *Id.*; Plan § 6.13. Under New York law, the first step in interpreting a contract is to determine whether the contract is ambiguous. *See Space Imaging*

*Europe, Ltd. v. Space Imaging L.P.*, 38 F. Supp. 2d 326, 333-34 (S.D.N.Y. 1999). "A contract is not ambiguous when the language in it has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Id.* at 334 (quotation marks omitted). "Where an agreement is unambiguous on its face, it must be enforced in accordance with the plain meaning of its terms." *Vintage, LLC v. Laws Const. Corp.*, 920 N.E. 2d 342, 343 (N.Y. 2009) (mem.). In this case, the district court found that the Funding Agreement is unambiguous.

The district court judge whose order Dow is appealing has presided over the Dow Corning settlement since 1995. Another panel of this Court recently discussed the standard of review we apply when reviewing this judge's determination that a plan document in the Dow Corning bankruptcy is not ambiguous. *See In re Settlement Facility Dow Corning Trust*, 628 F.3d 769, 771-73 (6th Cir. 2010). The majority observed that "[o]ur court is reasonably well-equipped to determine whether a plan provision is ambiguous—we construe contracts all the time." *Id.* at 772. But it noted that when slogging through the morass of the Dow Corning settlement, we should recognize this judge's many years' experience in exploring this potentially treacherous area. *Id.* Ultimately, though, the majority concluded that "the determination whether a plan provision is ambiguous is not a point on which we substantially defer." *Id.* If we stay within the bounds of the plan documents and do not stray into extrinsic evidence, we can traverse the Dow Corning slough as well as the district court. We thus evaluate *de novo* the district court's determination that the Funding Agreement is unambiguous.

**B. Nature of the Dispute**

As a preliminary matter, we think it is important to note what is and is not disputed in this case. What is NOT disputed is Dow's total payment obligation. The plan documents clearly state that Dow is not required to pay a net present value in excess of $2.35 billion, calculated as of the Effective Date and using a discount rate of 7% per year.[5] Plan § 5.3; Funding Agreement § 2.01.

What is disputed here is the method used to ensure that Dow's payments do not exceed this funding cap. The gist of Dow's position is that if a Time Value Credit is not awarded for every early payment, its payments might exceed the net present value funding cap. Dow contends that the Annual Payment Ceilings must be reduced every time it makes a payment early. In other words, Dow argues that Time Value Credits are impliedly provided for all early payments, regardless of whether they are expressly set forth in the Funding Agreement, as they are for some payments but not for others. The Committee, on the other hand, contends that except in those instances where the plan documents explicitly provide for a credit to an Annual Payment Ceiling, the net present value funding cap is accomplished through the "true-up" provision which takes effect after the last Funding Period. *See* Funding Agreement § 2.05(a)(ii). The first issue we must resolve, then, is whether Time Value Credits are necessary for all early payments to enforce the net present value funding cap.

## C. Meaning and Operation of "Time Value Credit"

"Time Value Credit" is the term at the center of this dispute, so the logical point to begin our analysis is by figuring out exactly what it means. Since "Time Value Credit" is capitalized in the Funding Agreement, it is a defined term. Funding Agreement § 1.01. Unfortunately, it is a very

---

[5]As discussed below, there is a possible exception to this funding cap.

poorly defined term. The Funding Agreement incorporates definitions from several other plan documents, including the Plan itself, Funding Agreement § 1.01, but Time Value Credit is not defined in those documents. The term appears only in the Funding Agreement. And it appears in the Funding Agreement three times—twice in § 2.01(a)(ii) and once in § 2.02(d)—before it is finally defined in § 2.03(b). The term also appears several times after § 2.03(b), but only in a section governing modification, which is not relevant to this appeal.

The first two appearances of Time Value Credit are in a provision dealing with Insurance Proceeds received by Dow before the Effective Date. Funding Agreement § 2.01(a)(ii). It provides that Dow receives a credit for the nominal amount of Insurance Proceeds it held in trust on the Effective Date and paid immediately after the Effective Date. The credit is to be applied toward the Annual Payment Ceiling in Funding Period 1. In addition to crediting the nominal amount of the Insurance Proceeds, Dow is entitled to a Time Value Credit of 7% per year calculated from the date the Insurance Proceeds were received by the Trust until the beginning of Funding Period 1.

The third appearance of Time Value Credit is in a provision dealing with payments received by the Trust after Funding Period 2. Funding Agreement § 2.02(d). It provides that if during any Funding Period after Funding Period 2 the total amount of cash and Insurance Proceeds received by the Trust exceeds the applicable Annual Payment Ceiling, the excess amount will be credited against the Annual Payment Ceiling in the next Funding Period, "together with a Time Value Credit calculated at the rate of 7% per annum from the date of receipt of the excess by the [Trust] until the beginning of the next Funding Period." Funding Agreement § 2.02(d).

The two provisions described above refer to payments—either cash or Insurance Proceeds—received *before* the Effective Date or *after* Funding Period 2. Insurance Proceeds received *between* the Effective Date and the end of Funding Period 2 receive special treatment in the Funding Agreement, and Time Value Credit is finally defined in the provision dealing with these Insurance Proceeds.

If Insurance Proceeds received between the Effective Date and the end of Funding Period 2 exceed the Annual Payment Ceilings of Funding Periods 1 and 2, the excess amount receives its own defined term: "Excess Insurance Proceeds." Funding Agreement § 2.03(a). Insurance Proceeds and cash received in other Funding Periods that exceed the Annual Payment Ceilings of those Funding Periods are described generically as "excess," *see* Funding Agreement § 2.02(d), and are not within the definition of "Excess Insurance Proceeds."

"Excess Insurance Proceeds" are credited against future Annual Payment Ceilings in a unique way. Although received before the end of Funding Period 2, they are not credited toward the Annual Payment Ceiling of Funding Period 3. Instead, they are credited in Funding Periods 5-8 in specified proportions, thereby "smoothing out" the effect these credits have on the Annual Payment Ceilings, as discussed at oral argument. Funding Agreement § 2.03(b)—the only instance where Time Value Credit is defined—provides the following:

> Excess Insurance Proceeds shall be credited against future Annual Payment Ceilings as provided in this Section 2.03 to adjust the Annual Payment Ceilings in Section 2.01(b) so as to maintain a net present value for the aggregate maximum payments of $2,350,000,000, discounted at the rate of 7% per annum, to the Effective Date. To achieve this, the amount of such credit shall equal the amount of the Excess Insurance Proceeds plus an additional amount (the "Time Value Credit") calculated at the rate of 7% per annum, compounded annually, from the date of receipt of the

Excess Insurance Proceeds until the first day of the Funding Period for the Annual Payment Ceiling against which they are to be credited becomes due. Excess Insurance Proceeds together with the applicable Time Value Credit will be credited against Annual Payment Ceilings due in each of Funding Periods 5 through 8, in the following proportions:

>    Funding Period 5: 50% of Excess Insurance Proceeds and the applicable Time Value Credit thereon;

>    Funding Period 6: 30% of Excess Insurance Proceeds and the applicable Time Value Credit thereon;

>    Funding Period 7: 10% of Excess Insurance Proceeds and the applicable Time Value Credit thereon;

>    Funding Period 8: 10% of Excess Insurance Proceeds and the applicable Time Value Credit thereon.

>    To the extent that the amount to be credited under this subsection exceeds the relevant Annual Payment Ceiling obligation, the excess amount will be credited against Annual Payment Ceilings due in the immediately succeeding Funding Period(s) including the applicable Time Value Credit.

This provision is obtuse to be sure, but it does provide some insight into the meaning of "Time Value Credit." Viewing together this provision dealing with "Excess Insurance Proceeds" and the other provisions dealing with generic excess payments, the following meaning of Time Value Credit can be discerned: If a payment is to be credited against a future Annual Payment Ceiling, the Funding Agreement *sometimes* provides that the amount credited shall include both the nominal amount of the payment and an additional amount—a Time Value Credit—that accounts for some or all of the period between the receipt of the payment by the Trust and the time the credit is applied. But the Funding Agreement does not provide a Time Value Credit for every payment credited against

a Future Annual Payment Ceiling, and as will be seen below, the Time Value Credits provided for are not always calculated in the same way.

**D. Time Value Credit and Net Present Value Adjustment Distinguished**

When considering the meaning of "Time Value Credit," it is also crucial to distinguish between a *credit* to a future Annual Payment Ceiling and a net present value *adjustment*. Dow asserts that the concepts are the same, but they clearly are not. The Funding Agreement refers to *adjusting* Dow's payments to the Effective Date to compare their net present value with the net present value funding cap. Funding Agreement § 2.01. "Net present value adjustment" is a convenient way to refer to this adjustment calculation, but it is not a defined term. As mentioned above, with a possible exception identified below, all payments must be adjusted to the Effective Date to ensure that the net present value of all the payments does not exceed a total net present value of $2.35 billion. Time Value Credits, on the other hand, perform a different function altogether. A Time Value Credit is only applicable when a payment is required by the Funding Agreement to be credited against a future Annual Payment Ceiling. The key word is "credit."

In an effort to equate Time Value Credits with net present value adjustments, Dow has created a hybrid term. Dow's briefs refer to a "Time Value Credit adjustment." But this term does not appear in the Funding Agreement itself, and it conflates the distinct concepts of credits and adjustments. Although the Claims Administrator must "adjust" the Annual Payment Ceilings when Dow receives a Time Value Credit, by its terms and by its operation, a Time Value Credit is a

"credit," not an "adjustment." A Time Value Credit is only applicable when Dow is entitled to credit a payment against a future Annual Payment Ceiling. In that situation, sometimes Dow is entitled to credit the time value of the payment as well as the nominal amount, and sometimes it is not. *Crediting* the time value of an excess payment against a future Annual Payment Ceiling is a separate calculation from *adjusting* Dow's total payments to the Effective Date to compare their net present value with the net present value funding cap.

Furthermore, and most importantly, Time Value Credits are not necessary to ensure that the net present value of Dow's total payments does not exceed the $2.35 billion net present value funding cap. The cornerstone of Dow's position in this case is that unless it receives the Time Value Credits it seeks, it may be required to pay an amount greater than the net present value funding cap. Dow states that "[o]nly by giving [Time Value Credit] adjustments for both pre- and post-Effective Date funding in excess of or at a time when there was no outstanding Annual Payment Ceiling can the Plan's net present value funding cap be enforced." Appellant Br. 15.

Time Value Credits certainly benefit Dow because they operate to reduce the Annual Payment Ceilings and thus reduce its obligation to make cash payments to cover any deficiencies in reserves and Insurance Proceeds. But Time Value Credits are not necessary to enforce the net present value funding cap because the Funding Agreement contains two other provisions that perform this function. First, the Funding Agreement contains a "true-up" provision that requires the Claims Administrator, after the final Funding Period, to calculate the net present value as of the Effective Date of all payments Dow has made. *See* Funding Agreement § 2.05(a)(ii). This provision ensures that at the end of the last funding period, with a possible exception identified

below, all Dow's payments will be adjusted to the Effective Date to compare their net present value with the net present value funding cap.

Of course, Dow might legitimately worry that this true-up will be performed too late. If it turns out that the net present value of Dow's payments exceeds the net present value funding cap, Dow might not be able to recover funds already paid out to claimants. But this potential problem is solved by another provision in the Funding Agreement—a provision that neither Dow nor the Committee has cited in their briefs. Funding Agreement § 2.01(c) provides that at any time, if Dow has paid "all amounts required by this Agreement"—that is, if the net present value of its total payments equals $2.35 billion—then Dow can seek confirmation from the district court that its funding obligations are terminated. This provision completely undermines Dow's position that Time Value Credits are necessary to enforce the net present value funding cap. So long as Dow keeps track of the net present value of its payments and promptly petitions the district court to declare its funding obligations terminated, it will never be required to pay more than it agreed to pay.

When a Time Value Credit is viewed as a credit that merely benefits Dow in the short run but is not designed to enforce the net present value funding cap in the long run, Dow's position evaporates. The true-up and termination provisions protect Dow from paying more than it agreed to pay. Time Value Credits are an additional benefit that Dow should receive only where the Funding Agreement specifically provides for them. The next issue, then, is whether the district court failed to award Time Value Credits for payments when the Funding Agreement specifically provided for them. As explained below, the answer is no, although we must correct one erroneous conclusion in the court's order.

**E. Payments at Issue**

*1. Initial Payment ($985 million)*

Before the Effective Date, Dow made an Initial Payment of $985 million. *See* Funding Agreement § 2.01(a). Dow claims that it was not required to make this payment until the Effective Date and therefore should receive a "Time Value Credit adjustment" for making the payment early. The district court found that Dow is not entitled to a Time Value Credit for the Initial Payment. We agree.

As explained above, a Time Value Credit is not an adjustment. The nominal amount of the Initial Payment is not credited against any of the Annual Payment Ceilings, so neither should its time value be credited against those ceilings. Because the Funding Agreement does not provide a Time Value Credit for the Initial Payment, Dow is not entitled to one.

*2. Pre-Effective Date Payment for Class 6D Claims ($18.4 million)*

Dow paid $18.4 million to settle Class 6D claims before the Effective Date. It claims that it is entitled to a "Time Value Credit adjustment" for this payment. The district court found that because this provision does not use the term Time Value Credit, Dow is not entitled to a Time Value Credit for this payment. We agree.

The Funding Agreement provides:

> All payments to be made by Dow Corning directly to the 6A-6D Funds on or before ninety (90) days after the Effective Date shall be deducted from the next payment due from Dow Corning under this Agreement, and Dow Corning shall receive appropriate credit, including [a net present value] adjustment in its funding obligation in this Funding Payment Agreement.

Funding Agreement § 2.10(c). If Dow were entitled to a Time Value Credit for these payments, the Funding Agreement would say so. The parties certainly knew how to specify when a Time Value Credit was required, since they did so elsewhere in the Funding Agreement.

However, the phraseology in this provision is admittedly confusing. The provision says that Dow "shall receive appropriate credit, including [a net present value] adjustment in its funding obligation." We have explained that Time Value Credits and net present value adjustments are separate concepts, but this phrase almost appears to conflate the two. But it is important to note the nature of the payment to which this phrase refers. In contrast to most of the other payments described in the Funding Agreement, this phrase refers to payments that Dow is making not to the Trust but instead directly to separate funds. Funding Agreement § 2.10(c). Since § 2.01 says that Dow agreed to make payments "to the Settlement Facility"—i.e. the Trust—up to a maximum net present value of $2.35 billion, § 2.10(c) needed to specify that Dow would receive "credit" for its direct payments to these other funds for purposes of the net present value funding cap.

Furthermore, it is noteworthy that the provision does not say that Dow will receive the "[net present value] adjustment" in the "next payment due"—the point at which it receives credit for the nominal value of the payment. Instead, the phrase "appropriate credit, including [a net present value] adjustment in its funding obligation" is best read to mean that both the nominal amount and the timing of these payments will be taken into account through a net present value adjustment to Dow's total "funding obligation." In short, the nominal value of this payment is credited against the "next payment due," and the net present value of the payment is included when determining the net present value of Dow's total payments.

- 17 -

> *3. Insurance Proceeds Paid in Funding Period 3 ($57,736,990)*

The Trust received $57,736,990 in Insurance Proceeds in Funding Period 3. Dow claims that this payment exceeded the Annual Payment Ceiling of Funding Period 3 ($374 million), and therefore it is entitled to have this excess amount, with a "Time Value Credit adjustment," credited against successive Annual Payment Ceilings. The district court found that Dow was not entitled to a Time Value Credit for this payment. We agree.

This payment would only have exceeded the Annual Payment Ceiling of Funding Period 3 if we held that Dow was entitled to a Time Value Credit for the Initial Payment and that amount was credited against the Annual Payment Ceilings of Funding Periods 1-3. Otherwise the money received in Funding Period 3 would fall below the Annual Payment Ceiling . Having concluded above that Dow is not entitled to a Time Value Credit for the Initial Payment since the Funding Agreement does not provide for one, the $57,736,990 in Insurance Proceeds paid in Funding Period 3 did not exceed the Annual Payment Ceiling, and Dow is not entitled to a Time Value Credit for this payment.

Although Dow is not entitled to a Time Value Credit for these specific Insurance Proceeds because they did not exceed the Annual Payment Ceiling, we disagree with the district court to the extent it found that Dow is *never* entitled to Time Value Credits in Funding Periods after Funding Period 2. *See* R. 836, Order, PageID # 14197. This finding ignores Funding Agreement § 2.02(d), which provides:

> In any Funding Period after Funding Period 2 in which the total amount of cash and Insurance Proceeds received by the Settlement Facility exceeds the applicable Annual Payment Ceiling (as adjusted pursuant to Sections 2.03-2.05), the

excess over the Annual Payment Ceiling will be credited against the Annual Payment Ceiling in the next Funding Period(s), together with a Time Value Credit calculated at the rate of 7% per annum from the date of receipt of the excess by the Settlement Facility until the beginning of the next Funding Period.

This provision clearly entitles Dow to Time Value Credits if the Trust receives funds in excess of the Annual Payment Ceiling in any Funding Period after Funding Period 2. Therefore, to the extent the district court's order says that Dow will never be entitled to a Time Value Credit for Insurance Proceeds received after Funding Period 2, the order is in error. Although we have determined that the Annual Payment Ceiling was not exceeded in Funding Period 3, we have no way of knowing whether a future Annual Payment Ceiling might be exceeded.

*4. Pre-Effective Date Insurance Proceeds ($211,456,278)*

Dow received $211,456,278 in Insurance Proceeds before the Effective Date. Funding Agreement § 2.01(a)(ii) required the following:

> Insurance Proceeds held by Dow Corning on the Effective Date shall be held in trust for the benefit of the Trust and paid to the Trust 90 days after the Effective Date and credited against the Annual Payment Ceiling for Funding Period 1, together with a Time Value Credit calculated at the rate of 7% per annum from the date of receipt of such excess by the Settlement Facility until the beginning of Funding Period 1. To the extent the amount to be credited (including the Time Value Credit) exceeds the Annual Payment Ceiling for Funding Period 1, such excess shall be credited against the Annual Payment Ceiling for Funding Period 2.

The district court found that "Dow Corning is entitled to Time Value Credit on Insurance Proceeds upon receipt by the Settlement Facility only until the beginning of Funding Period 1, to be credited, if in excess of the Annual Payment Ceiling for Funding Period 1, against the Annual Payment Ceiling for Funding Period 2." R. 836, Order, PageId # 14194. In other words, it found

that Dow was not entitled to a second Time Value Credit for the excess that rolled over into Funding Period 2.

Having found that a Time Value Credit is a benefit that Dow receives only when the Funding Agreement explicitly provides it, we agree. The Funding Agreement says that Dow gets a Time Value Credit from the date of receipt of the excess Insurance Proceeds until the beginning of Funding Period 1. It does not provide another Time Value Credit for the amount that rolls over into Funding Period 2. Therefore, we conclude that Dow receives only the Time Value Credit specifically provided for in the Funding Agreement.

> *5. Payment for Settlement Facility Access to MDL 926 Claims Office Materials ($2.9 million); Payment from Dow's MDL 926 Escrow Account ($2,180, 656); Payment to Class 4A Claimants ($7.2 million)*

The parties each briefly address whether Dow should receive Time Value Credits for these three relatively small payments, all of which were made after the Effective Date and before the start of the first Funding Period. The district court found that Dow was not entitled to a Time Value Credit for these payments because the Funding Agreement does not provide for one. We agree. Because the Funding Agreement does not provide a Time Value Credit for these payments, Dow is not entitled to one.

## F. Net Present Value Adjustment for the Initial Payment

In addition to disputing the eight Time Value Credits sought by Dow, the parties also dispute whether Dow should receive a net present value adjustment for the Initial Payment which was paid several years before the Effective Date. (Recall that the Initial Payment was placed into escrow with the interest accruing to the benefit of the Trust.) The Funding Agreement has a special provision

addressing the effect the actual interest received on $905 million of the Initial Payment would have on the net present value funding cap. It provides that the interest received on this amount "shall not be included in calculating the payment of the net present value of $2,350,000,000 under this Agreement." Funding Agreement § 2.01(a). Although clearly the actual interest is disregarded when calculating the net present value, the parties dispute whether the $905 million should be adjusted to the Effective Date using the 7% discount rate used to adjust the other payments.

This issue was first raised and argued in the briefs on appeal. At oral argument, it was unclear whether the parties think this issue needs to be decided now. They informed us that they need to know how much room remains under the net present value funding cap so that they can plan how to allocate payments to different classifications of claimants. However, they also indicated that the issue on this appeal is how to calculate the Annual Payment Ceilings, not how to calculate the net present value of the total payments. Because the issue of a net present value adjustment for the Initial Payment was not argued below and resolved in the first instance by the district court, we decline to address it for the first time on appeal. *See Elkins v. Richardson-Merrell, Inc.*, 8 F.3d 1068, 1072 (6th Cir. 1993) ("This court does not normally address issues raised for the first time on appeal.").

### III. CONCLUSION

The district court was correct to distinguish between Time Value Credits and net present value adjustments. Time Value Credits are *credits* that operate to reduce the Annual Payment Ceilings when expressly provided for in the Funding Agreement. Net present value adjustments, on the other hand, are the *adjustments* made to compare the net present value of Dow's total payments

with the $2.35 billion net present value funding cap. Accordingly, we **AFFIRM** the district court's order with respect to every finding except its determination that Dow is never entitled to a Time Value Credit for Funding Periods after Funding Period 2. The Funding Agreement clearly states that if the cash and Insurance Proceeds received by the Trust during these Funding Periods exceeds the applicable Annual Payment Ceiling, Dow is entitled to a Time Value Credit for the excess. We hold that the Funding Agreement is unambiguous and that Dow is entitled to Time Value Credits only where expressly provided by the Funding Agreement. We express no opinion as to whether Dow is entitled to a net present value adjustment for the Initial Payment.